FILED

2013 FEB 13  PM 4: 25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2012 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>MONGOL NATION,<br>an unincorporated association,<br><br>          Defendant. | Case No. CR 13 00106<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(c):<br>Racketeering;<br>18 U.S.C. § 1962(d):<br>Racketeering Conspiracy;<br>18 U.S.C. § 1963: Criminal<br>Forfeiture] |

The Grand Jury charges:

## COUNT ONE

[18 U.S.C. § 1962(c)]

### I. INTRODUCTION

A.   THE MONGOLS GANG

1.   At all relevant times, the Mongols Outlaw Motorcycle Gang ("the Mongols Gang"), was an organization engaged in, among

1  other things, murder, conspiracy to commit murder, attempted
2  murder, conspiracy to traffic in narcotics, narcotics-
3  trafficking, robbery, extortion, money laundering, and witness
4  intimidation. At all relevant times, the Mongols Gang operated
5  in the Central District of California and elsewhere. The
6  Mongols Gang, including its leadership, full patched members,
7  prospective and probationary members, and associates (often
8  referred to as "hang arounds"), constituted an "enterprise," as
9  defined by Title 18, United States Code, Section 1961(4), that
10 is, a group of individuals associated in fact. The Mongols Gang
11 engaged in, and its activities affected, interstate and foreign
12 commerce. The Mongols Gang constituted an ongoing organization
13 whose leadership, full patched members, prospective and
14 probationary members, and associates (often referred to as "hang
15 arounds") (all hereafter referred to collectively as "Mongols")
16 functioned as a continuing unit for a common purpose of
17 achieving the objectives of the organization.
18     2.    The Mongols Gang maintained an established structure
19 and leadership. The Mongols Gang maintained a written
20 constitution and by-laws, which set forth the rules of
21 membership and code of conduct for the Mongols Gang, as well as
22 penalties for non-compliance with the Mongols Gang's rules.
23     3.    The Mongols Gang was a nationwide organization and
24 made efforts to expand internationally. The Mongols Gang was

1  comprised of approximately sixty-eight identified chapters.  The

2  chapters were located in different geographical regions,

3  although most were located within the Central District of

4  California.  The Mongols Gang also had chapters in other parts

5  of California, as well as in, among other places, Oklahoma,

6  Florida, Nevada, Oregon, Utah, Arizona, Colorado, Sweden,

7  Norway, Italy, Germany, and Mexico.

8      4.   The leadership and governing body of the Mongols Gang

9  was its "Mother Chapter."  The Mother Chapter exercised

10 authority over the actions of the regional chapters, as well as

11 the actions of individual Mongols.  Mongols paid money to the

12 Mother Chapter in the form of fees, dues and taxes.  Those funds

13 were used, in part, to fund and promote the Mongols Gang and pay

14 for the legal expenses of Mongols when they were prosecuted for

15 crimes committed on behalf of the Mongols Gang.  The Mother

16 Chapter collected and reviewed membership applications and fees,

17 resolved disputes within the Mongols Gang, and issued

18 incentives, such as tattoos and patches, to honor Mongols for

19 committing acts of violence on behalf of the Mongols Gang,

20 incurring physical injury on behalf of the Mongols Gang, and

21 performing specific sexual acts at Mongols Gang events.

22     5.   The Mother Chapter was comprised of the Mongols Gang's

23 national officers.  At relevant times, it included full patched

24

1  members Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector

2  Gonzalez.

3        6.   Officers of the Mongols Gang's regional chapters were

4  often invited to present issues to the Mother Chapter for

5  decision, but these officers were not permitted to share in the

6  deliberations of the Mother Chapter, and the Mother Chapter's

7  decisions were binding on the regional chapters.  Lower-ranking

8  full patched members and prospective and probationary members of

9  the Mongols Gang frequently were required to patrol and provide

10  armed security against the presence of law enforcement and rival

11  gang members outside Mother Chapter meetings.  Those present at

12  Mother Chapter meetings were heavily armed, and the Mother

13  Chapter maintained an arsenal of firearms, including assault

14  rifles, shotguns, and semi-automatic handguns, as well as

15  bullet-proof vests and knives, at the Mother Chapter residence

16  located in West Covina, California.

17        7.   Below the Mother Chapter, regional chapters of the

18  Mongols Gang were directed by chapter presidents and officers,

19  including a vice-president, a secretary/treasurer, and a

20  sergeant-at-arms.  A regional chapter's sergeant-at-arms

21  maintained that chapter's weapons and firearms and might also be

22  required to maintain records of membership applications and to

23  oversee the evaluation of prospective and probationary members

24  by private investigators.

1        8.   All national and regional officers of the Mongols Gang

2    were required to be full patched members of the Mongols Gang.

3    Full patched members of the Mongols Gang identified themselves

4    with patches, tattoos and insignia that signified their

5    connection to and status within the Mongols Gang.   Specifically,

6    full patched members of the Mongols Gang were authorized by the

7    Mongols Gang to wear leather vests with sewn-on patches that

8    included: a "top rocker" patch on the back containing the word

9    "Mongols," most often in the following form:



18   (the "Word Image"); a patch on the front with the word

19   "Mongols," most often in smaller capital letters; a "center

20   rocker" patch in the center of the back of the vest that

21   consisted of the image of a Mongols Gang motorcycle rider, that

22   is, a human head with a queue, facial hair, and sunglasses, as

23   follows:

M.C.

(the "Rider Image"); and a "bottom rocker" patch below this

bearing the name of the state of the chapter to which the member

belonged.   Many full patched members also displayed a patch with

the designation "1%" to distinguish themselves from the "99%" of

motorcycle club members who were legitimate and law-abiding and

identify themselves as being within the "1%" who were not

legitimate and did not adhere to the law or the rights of

others.   Full patched members of the Mongols Gang also often

displayed the "MFFM" patch or tattoo to identify themselves as

"Mongols Forever Forever Mongols."   Full patched members who

were officers also frequently wore patches that indicated their

status as officers.   The Mongols Gang had as many as 500 to 600

full patched members.   Approximately 400 of those were located

in Southern California.

          9.   In addition to full patched members, the Mongols Gang

was also comprised of prospective and probationary members

working towards becoming full patched members.   Leaders of the

1   Mongols Gang recruited and initiated potential members into the

2   organization through a structured application and vetting

3   process that was directed through the Mother Chapter in West

4   Covina, California.   Potential members had to be sponsored by

5   existing full patched members and were required to demonstrate

6   their obedience and loyalty to the Mongols Gang.   They were then

7   required to complete a written application, which was reviewed

8   and researched by private investigators, and then might be

9   subject to a polygraph examination arranged by the Mongols Gang

10  if they were suspected of being a member of law enforcement or

11  an informant for law enforcement.   The focus of the

12  investigation conducted before a potential member could become a

13  prospective or probationary member of the Mongols Gang was to

14  establish the potential member's willingness to commit crimes on

15  behalf of the Mongols Gang and to preclude prospective

16  membership of individuals with any connection to law enforcement

17  or who might expose the crimes of the Mongols Gang to law

18  enforcement.   Once a potential member passed the initial

19  application process, the potential member could be accepted as a

20  prospective or probationary member.

21      10.   When an individual first became a prospective member,

22  referred to as a "prospect," he was given the bottom rocker

23  patch, a small rectangular front patch of the word "PROSPECT,"

24  and a small rectangular "Chapter" tab patch indicating the

1  chapter the prospective member was seeking to join. The
2  prospect was then assigned to perform duties for full patched
3  members of the Mongols Gang, including providing armed security,
4  storing weapons and narcotics, and transporting Mongols Gang
5  leaders. After a period of time as a prospect, the individual
6  received his center rocker patch bearing the Rider Image. This
7  indicated that the prospect was one step closer to becoming a
8  full member, but still remained required to perform the tasks
9  above, and to be on call to Mongols members to perform such
10  duties 24 hours a day. The amount of time spent as a prospect
11  before becoming a full patched member of the Mongols gang and
12  receiving a top rocker patch (the Word Image) varied by prospect
13  and was contingent on approval of the prospect's membership by
14  the Mother Chapter.

15       11. An alternative path to full patched membership was as
16  a probationary member. Probationary members received all three
17  back patches, bottom rocker, center rocker (Rider Image), and
18  top rocker (Word Image) from the outset, but were also required
19  to wear a probationary patch, a small diamond-shaped patch with
20  a black "P" against a white background, to identify them as
21  probationary members. Probationary members typically remained
22  on probation for one year before becoming full patched members
23  and being authorized to remove the probationary patch. Whether
24  potential members went through a "prospect" or "probationary"

1  phase before becoming full patched members varied depending on

2  the chapter the individual was seeking to join.

3      12.   In addition to full patched members and prospective

4  and probationary members, the Mongols Gang also included male

5  associates, often referred to as "hang arounds," who were not on

6  a membership track and did not receive any gang patches.  Women

7  were not eligible to be either full patched or prospective or

8  probationary members.  Women could, however, be permitted by

9  full patched members to wear a Mongols Gang jacket or vest, but

10 were required to display on the jacket or vest a "property of"

11 patch identifying the full patch or prospective or probationary

12 member to whom they were connected.

13     13.   In addition to patches indicating their status within

14 the Mongols Gang, Mongols could be awarded special patches based

15 on acts engaged in to demonstrate their loyalty to the Mongols

16 Gang.  Full patched members were eligible to earn patches issued

17 by the Mother Chapter, including: the skull and crossbones

18 patch, awarded for killing someone on behalf of the Mongols

19 Gang; the "Respect Few Fear None" patch, awarded for having

20 engaged in a violent altercation with a rival gang; and the

21 Black Heart patch, awarded for having been wounded during a

22 Mongols Gang confrontation.  Full patched members and

23 prospective and probationary members were encouraged and

24 expected to engage in sex acts at Mongols Gang functions or when

1  pre-arranged "wing parties" were held, and those who did so were

2  rewarded with different-colored "wings patches" that identified

3  the sex acts performed.

4      14.  Mongols Gang leaders controlled Mongols activities not

5  only through rewards, but also through internal discipline,

6  including killing, attempting to kill, conspiring to kill,

7  assaulting, and threatening Mongols and others who were deemed

8  to present a threat to the Mongols Gang or its leadership.

9  Mongols who were "out bad," that is, who attempted to leave the

10 Mongols Gang or acted in ways contrary to the desires of Mongols

11 Gang leaders, could be required to forfeit their property,

12 including their motorcycles, and were subject to attack by other

13 Mongols.

14 B.   THE CRIMINAL ACTIVITIES OF THE MONGOLS GANG

15     15.  Crimes committed by Mongols on behalf of the Mongols

16 Gang included acts of violence ranging from battery to murder,

17 as well as drug-trafficking offenses, money laundering, weapons-

18 trafficking, extortion, and hate crimes directed against

19 African-Americans.  Mongols also frequently conducted robberies,

20 stole motorcycles, and engaged in the theft of credit card

21 account information as a means to obtain funds for themselves

22 and the Mongols Gang.  Mongols often committed their crimes and

23 acts of violence with the conviction that they could not be

24 prosecuted because victims and witnesses would refuse to testify

1  against them or to cooperate with law enforcement for fear of

2  retaliation by the Mongols Gang.  Mongols frequently used the

3  reputation of the Mongols Gang, especially its history of large-

4  scale violence and riots, as a means to threaten and intimidate

5  the victims and witnesses to their crimes and protect Mongols

6  from prosecution by local law enforcement.

7       16.  The Mongols Gang actively engaged in drug-trafficking,

8  especially the distribution of methamphetamine and cocaine, both

9  within the Mongols Gang and to outside customers, as a source of

10  income.  Portions of the proceeds from drug-trafficking

11  activities were owed to the Mongols Gang leadership and Mother

12  Chapter and were collected in the form of dues, membership fees,

13  and taxes.  Large-scale drug traffickers within the Mongols Gang

14  were often taxed at a higher rate by the Mongols Gang, with the

15  payments used to support the drug traffickers' protection from

16  penalties and taxes that would ordinarily be claimed by rival

17  street gangs and Mexican Mafia (aka "La Eme") representatives

18  for drug trafficking that occurred in the areas controlled by

19  those rival gangs.  Mongols were also authorized to call on

20  other Mongols and Mongols Gang leadership to enforce the

21  collection of proceeds owed from their narcotics customers.

22       17.  Many Mongols were current or former members of a large

23  number of Los Angeles County street gangs, including "the

24  Avenues," "18th Street," "San Gabriel Valley," "South Side

Montebello," "Lott Stoner," "Maravilla," and "Varrio Nuevo" street gangs, and maintained their connections to those gangs, particularly with regard to the distribution of narcotics and firearms.   These Mongols often claimed immunity from the collection of taxes on their drug trafficking activities by Mexican Mafia representatives.   This created tension between the Mongols Gang and the established authority of the Mexican Mafia over drug trafficking.   Mongols Gang leaders including Ruben Cavazos, Sr., and Hector Gonzalez, periodically attempted to negotiate a resolution of their disputes with the Mexican Mafia over the control of drug trafficking in particular territories by paying Mexican Mafia representatives in exchange for their recognition of the Mongols Gang's right to traffic narcotics in Southern California.

18. Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector Gonzalez, and Mongols Gang full patched members also enforced the authority of the Mongols Gang by directing attacks against rival motorcycle gangs, such as the "Hells Angels" and the "Sons of Silence." Mongols identified persons supporting rival gangs and threatened to beat or kill them if they did not surrender indicia (such as red and white colored t-shirts, patches, jackets or sports jerseys bearing the number "81") identifying support for a rival gang.

19.   The Mongols Gang also enforced its authority by directing attacks against members of the general public who defied or unwittingly came into contact with Mongols in a way that was deemed "disrespectful" to the Mongols Gang.   Persons in conflict with, or who might be perceived to have shown disrespect to, Mongols were often beaten severely or even killed by being kicked repeatedly with steel-toed boots, stabbed, or shot.

20.   The Mongols Gang also directed attacks against law enforcement officers and witnesses who were willing to cooperate with law enforcement for the prosecution of crimes committed by Mongols, and frequently paid for the legal representation of Mongols who committed crimes, such as assaults and murders, on behalf of the Mongols Gang.

21.   The Mongols Gang did not allow African-Americans to be members.   The Mongols Gang was also hostile to the presence of African-Americans in bars or clubs where Mongols were present or in proximity to female associates of the Mongols Gang.

22.   The Mongols Gang maintained a ready supply of firearms, including handguns, shotguns, automatic and semi-automatic assault rifles, and machine-guns, to enforce its authority.   These firearms often were stolen or unregistered so that their use could not be readily connected to the Mongols who used and maintained them.   Mongols often discarded or destroyed

1   firearms after their use in incidents related to the Mongols

2   Gang.  The Mongols Gang, therefore, maintained a steady source

3   of supply for additional unregistered or non-traceable firearms.

4   C.   DEFENDANT AND ITS REGISTRATION OF THE WORD AND RIDER MARKS

5        23.  At all relevant times, defendant MONGOL NATION was an

6   unincorporated association comprised of full patched members of

7   the Mongols Gang who, among other things, maintained authority

8   to control the use and display of the Word Image and Rider

9   Image.  Defendant MONGOL NATION controlled the use and display

10  of the Word Image and the Rider Image.

11       24.  On or about January 11, 2005, as the result of an

12  application caused to be submitted by Ruben Cavazos, Sr., at the

13  time the President of the Mongols Gang, defendant MONGOL NATION

14  was granted registration of the Word Image with the United

15  States Patent and Trademark Office ("USPTO") as a collective

16  membership mark (the "Word Mark") (registration number 2916965).

17       25.  On or about about April 4, 2006, as the result of an

18  application caused to be submitted by Ruben Cavazos, Sr., at the

19  time the President of the Mongols Gang, defendant MONGOL NATION

20  was granted registration of the Rider Image with the USPTO as a

21  trademark/service mark (the "Rider  Mark") (registration number

22  3076731).

23       26.  On or about March 26, 2008, Ruben Cavazos, Sr., at the

24  time the President of the Mongols Gang, purported to cause

1  defendant MONGOL NATION to assign its entire interests in the

2  Word and Rider Marks to Shotgun Production, LLC, a company

3  wholly and solely owned and controlled by Ruben Cavazos, Sr.

4  The USPTO recorded this assignment on or about April 3, 2008.

5      27.  Between April 3, 2008 and October 2008, Ruben Cavazos,

6  Sr., was removed as President of the Mongols Gang and replaced

7  by Hector Gonzalez, who disputed the validity of the assignment

8  of MONGOL NATION's entire interests in the Word and Rider Marks

9  to Shotgun Production, LLC.  On or about  October 13, 2008,

10 Hector Gonzalez, at the time the President of the Mongols Gang,

11 caused to be filed with the USPTO a "corrective assignment" of

12 the Word and Rider Marks from Shotgun Production, LLC back to

13 defendant MONGOL NATION, asserting, among other things, that:

14 (a) "Mongol Nation has invested substantial effort over the

15 years in the advertising and promotion of its products and

16 services to develop goodwill associated with" the Word and Rider

17 Marks; (b) "[m]embers of Mongol Nation are recognized by their

18 jackets which prominently display the [Word and Rider Marks] on

19 the back"; (c) the Word and Rider Marks "are, and have always

20 been, owned by Mongol Nation"; (d) Mongol Nation "controls the

21 use and quality of the services and goods provided under these

22 marks"; (e) the "over 800 members of Mongol Nation recognize the

23 [Word and Image Marks] as belonging to Mongol Nation; (f) Ruben

24 Cavazos, Sr., and Shotgun Productions LLC "fraudulent[ly]

1   created and filed the assignment in an attempt to appropriate

2   Mongol Nation's intellectual properties"; (g) "Shotgun's

3   recordation of the assignment was without knowledge or

4   authorization of Mongol Nation"; and (h) "[a]t no time did

5   Mongol Nation assign any rights in its marks to Mr. Cavazos or

6   Shotgun Productions."   The USPTO recorded the "corrective

7   assignment" on or about October 14, 2008.

8       28.   On or about December 17, 2008, Martin Guevara, at the

9   time a member of the Mongols Gang, caused Mongols Nation

10  Motorcycle Club, Inc., to be formally incorporated in the State

11  of California.

12      29.   On or about January 21, 2009, Martin Guevara, at the

13  time the president of the Mongols Gang, purported to assign the

14  entire interest in the Word and Rider Marks from defendant

15  MONGOL NATION to Mongols Nation Motorcycle Club, Inc.   The USPTO

16  recorded this assignment on or about January 22, 2009.

17      30.   On or about June 28, 2011, in ruling on a petition

18  filed by Mongols Nation Motorcycle Club, Inc., in United States

19  v. Ruben Cavazos, Sr., aka "Doc," et al., No. CR 08-1201-ODW,

20  the United States District Court for the Central District of

21  California held that the purported assignment by Ruben Cavazos,

22  Sr., of defendant MONGOL NATION's rights to the Word and Rider

23  Marks "to Shotgun Productions [, LLC], an entity under Cavazos'

24  sole control was invalid."

31.  On or about September 19, 2011, Mongols Nation Motorcycle Club, Inc., was voluntarily dissolved.  In its Certificate of Dissolution filed with the California Secretary of State, it verified that it never incurred any known debts or liabilities and never acquired any known assets.

32.  As a result of the invalidity of the purported intervening assignment of rights to the Word and Rider Marks to Shotgun Production LLC, and the voluntary dissolution and disavowal of ownership of any assets by Mongols Nation Motorcycle Club, Inc., at all relevant times since their registration with the USPTO, all rights in the Word and Rider Marks have been held by defendant MONGOL NATION.

33.  In registering and holding the rights to the Word and Rider Marks, defendant MONGOL NATION  furthered the criminal purposes of the Mongols Gang by furthering its control of the symbols, namely the Word Image and the Rider Image, that the Mongols Gang used both to identify Mongols who would participate in criminal activity on behalf of the Mongols Gang and to intimidate others by identifying Mongols who would take criminal action against them on behalf of the Mongols Gang if they took action contrary to the interests of the Mongols Gang.  In so acting, defendant MONGOL NATION conducted and participated in the conduct of the affairs of the Mongols Gang.

D.   PURPOSES OF THE ENTERPRISE

34.   The purposes of the Mongols Gang, including its leaders, full patched members, prospective and probationary members, and associates, included, but were not limited to, the following:

a.   Enriching the Mongols Gang through, among other things, control of and participation in the distribution of narcotics in territory controlled by the Mongols Gang.

b.   Maintaining the control and authority of the Mongols Gang over territory claimed by the Mongols Gang.

c.   Preserving, protecting, and expanding the power of the Mongols Gang through the use of intimidation, violence, threats of violence, assault, and murder.

d.   Promoting and enhancing the authority of the Mongols Gang and of its full patched members, prospective and probationary members, and associates.

E.   MEANS AND METHODS OF THE ENTERPRISE

35.   The means and methods by which defendant MONGOL NATION and its co-racketeers conducted and participated in the conduct of the affairs of the Mongols Gang included:

a.   Acting on behalf of the Mongols Gang under the authority conveyed by their display of the Word and Rider Images as authorized by defendant MONGOL NATION, Mongols committed, and attempted and threatened to commit, acts of

1  violence, including murder, to protect and expand the Mongols

2  Gang's criminal operations, which included assaults, murders,

3  intimidation, robberies, drug-trafficking and threats of

4  violence directed against rival gang members, law enforcement,

5  and potential witnesses to the crimes of the enterprise.

6          b.   Acting on behalf of the Mongols Gang under

7  the authority conveyed by their display of the Word and Rider

8  Images as authorized by defendant MONGOL NATION, Mongols

9  promoted a climate of fear through intimidation, violence and

10  threats of violence intended to promote the authority of the

11  Mongols Gang and insulate Mongols from liability for the drug-

12  trafficking and violent crimes of the Mongols Gang.

13          c.   Acting on behalf of the Mongols Gang under

14  the authority conveyed by their display of the Word and Rider

15  Images as authorized by defendant MONGOL NATION, Mongols

16  murdered, attempted to murder, assaulted, and threatened those

17  who posed a threat to the Mongols Gang.

18          d.   Acting on behalf of the Mongols Gang, in

19  accordance with agreements with rival gangs negotiated by

20  Mongols Gang leaders under the authority conveyed by their

21  display of the Word and Rider Images as authorized by defendant

22  MONGOL NATION, Mongols engaged in trafficking of controlled

23  substances as a means to generate income for themselves and the

24  Mongols Gang.

## II. THE RACKETEERING OFFENSE

36.  Beginning on a date unknown but at the latest by on or about March 16, 2002, and continuing to at least on or about May 25, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendant MONGOL NATION, an unincorporated association consisting of full patched members of the Mongols Gang criminal enterprise, being a person employed by and associated with the Mongols Gang criminal enterprise, which was a criminal enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly did conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of the racketeering acts set forth below.

## III. PATTERN OF RACKETEERING ACTIVITY

37.  The pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisted of the following acts:

38.  Racketeering Act One (Conspiracy to Distribute Cocaine and Methamphetamine): Beginning on a date unknown to the Grand Jury and continuing through at least on or about May 7, 2009, within the Central District of California and elsewhere, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, together with prospective and probationary members and associates of the Mongols Gang and

others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

     a.   To distribute  a mixture or substance containing a detectable amount of cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B); and,

     b.   To distribute  methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

39.  Racketeering Act Two (Attempted Murder): On or about December 4, 2005, in Riverside County, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, unlawfully attempted to kill with malice aforethought D.F., J.V., and S.G., in violation of California Penal Code Sections 187 and 664.

40.  Racketeering Act Three (Distribution of Methamphetamine):  On or about November 26, 2006, in Los Angeles County, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, knowingly and intentionally distributed methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

41.  Racketeering Act Four (Murder):  On or about February 14, 2007, in Los Angeles County, within the Central District of California, defendant MONGOL NATION, acting by and through a full patched member of the Mongols Gang and in concert with an associate of the Mongols Gang, with malice aforethought killed L.H., in violation of California Penal Code Section 187.

42.  Racketeering Act Five (Attempted Murder):  On or about April 8, 2007, in Los Angeles County, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, unlawfully attempted to kill with malice aforethought M.G. and Z.S., in violation of California Penal Code, Sections 187 and 664.

43.  Racketeering Act Six (Attempted Murder):  On or about April 6, 2008, in Pasadena, California, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, unlawfully attempted to kill with malice aforethought R.H. and J.H., in violation of California Penal Code Sections 187 and 664.

44.  Racketeering Act Seven (Distribution of Methamphetamine):  On or about April 10, 2008, in Montebello, California, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, knowingly and intentionally distributed

methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

45.   Racketeering Act Eight (Distribution of Methamphetamine):  On or about June 19, 2008, in Los Angeles, California, within the Central District of California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, knowingly and intentionally distributed methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

46.   Racketeering Act Nine (Murder):  On or about September 2, 2008, in San Francisco, California, defendant MONGOL NATION, acting by and through a full patched member of the Mongols Gang, with malice aforethought killed M.G., in violation of California Penal Code Section 187.

47.   Racketeering Act Ten (Murder):  On or about November 6, 2009, in Merced County, California, defendant MONGOL NATION, acting by and through full patched members of the Mongols Gang, with malice aforethought killed B.J., in violation of California Penal Code Section 187.

COUNT TWO

[18 U.S.C. § 1962(d)]

48.  The Grand Jury hereby repeats, realleges, and incorporates by reference paragraphs 1 through 35 and 37 through 47 of this Indictment.

THE RACKETEERING CONSPIRACY

49.  Beginning on a date unknown but at the latest by on or about March 16, 2002, and continuing to at least on or about May 25, 2012, in Los Angeles County, within the Central District of California and elsewhere, defendant MONGOL NATION, an unincorporated association consisting of full patched members of the Mongols Gang criminal enterprise, together with others known and unknown to the Grand Jury, being persons employed by and associated with the Mongols Gang criminal enterprise, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of: (a) multiple acts chargeable under the following provisions of California state law: murder, attempted

1 | murder, and conspiracy to commit murder, in violation of

2 | California Penal Code Sections 182, 187, and 664; and, (b)

3 | multiple acts involving conspiracy to distribute and

4 | distribution of controlled substances, including methamphetamine

5 | and cocaine, in violation of Title 21, United States Code,

6 | Sections 841(a)(1) and 846.  It was a further part of the

7 | conspiracy that defendant MONGOL NATION, acting by and through

8 | full patched members of the Mongols Gang, agreed that a

9 | conspirator would commit at least two acts of racketeering in

10 | the conduct of the affairs of the enterprise.

11 | A.   MEANS BY WHICH THE OBJECTS OF THE RACKETEERING CONSPIRACY
WERE ACCOMPLISHED

13 | 50.  The objects of the racketeering conspiracy were

14 | accomplished in substance as set forth below.

15 | 51.  Mongols Gang leaders and officers, including Ruben

16 | Cavazos, Sr., Ruben Cavazos, Jr., and Hector Gonzalez, conducted

17 | organizational meetings and directed Mongols to conduct and

18 | engage in robberies, assaults, murders, extortion, and drug

19 | trafficking, as well as the collection and management of money,

20 | including proceeds generated from unlawful activity by Mongols,

21 | to promote and further the activities of the Mongols Gang.

22 | 52.  Mongols Gang leaders, officers, full patched members,

23 | and prospective members, including Andres Rodriguez, Enrique

24 | Munoz, Joe Garcia, Manuel Armendarez, Rafael Lozano, Alex

1  Lozano, Manuel Vasquez, Edward Ramirez, Alberto Madrigal, Oscar

2  Hernandez, and others obtained and distributed methamphetamine

3  and cocaine to Mongols and other narcotics customers.

4      53.  Mongols Gang leaders and officers, including Ruben

5  Cavazos, Sr. and Hector Gonzalez, negotiated with Mexican Mafia

6  representatives concerning the collection of tax payments for

7  the narcotics-trafficking activities of Mongols in areas

8  otherwise controlled by the Mexican Mafia.

9      54.  Mongols Gang leaders, officers, full patched members,

10  prospective members, and associates, including Ruben Cavazos,

11  Sr., Ruben Cavazos, Jr., Hector Gonzalez, and Arthur Roseli,

12  obtained firearms, knives, bullet-proof vests and explosives to

13  be used to enforce the authority of the Mongols Gang against

14  rival gang members, the general public and law enforcement.

15      55.  Mongols Gang leaders and officers, including Ruben

16  Cavazos, Sr., Hector Gonzalez, William Michael Munz, and

17  Lawrence Wilson directed Mongols to travel to different

18  locations and commit acts of violence, including murder, against

19  rival gang members, law enforcement or other persons who

20  challenged the authority of the Mongols Gang.

21      56.  Mongols Gang leaders, officers, full patched members,

22  prospective members, and associates, including Ruben Cavazos,

23  Sr., William Michael Munz, Walter Ramirez, Andres Rodriguez,

24  Enrique Munoz, Shawn Buss, Manuel Armendarez, Rafael Lozano,

1 Alex Lozano, Denis Maldonado, Jose Norberto Montes, Austin

2 Melcer, Christopher Loza, John Newman, Thomas Savala,

3 Christopher Ablett, and others committed acts of violence,

4 including murder and attempted murder, against rival gang

5 members, law enforcement, and other persons who challenged the

6 authority of the Mongols Gang.

7    57.  Mongols Gang leaders, including Ruben Cavazos, Sr.,

8 and Hector Gonzalez, and others acting at their direction,

9 conducted financial transactions to conceal the proceeds derived

10 from the crimes of the Mongols Gang and convert those proceeds

11 to promote the crimes of the Mongols Gang and enrich themselves.

12    58.  Mongols Gang leaders and officers, including Ruben

13 Cavazos, Sr., and Ruben Cavazos, Jr., recruited new individuals

14 to become Mongols and directed their initiation into the Mongols

15 Gang.

16    59.  Defendant MONGOL NATION held and maintained trademark

17 rights in the Word and Image Marks, in order to limit and

18 control the use of the Word and Image Marks as a means of, among

19 other things, ensuring that the display of the Word and Image

20 Marks by Mongols engaged in the criminal activities described in

21 paragraphs 48 through 59 above conveyed that those criminal

22 activities were being carried out on behalf of the Mongols Gang.

23 ///

24 ///

B.    OVERT ACTS

60.   In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the following overt acts were committed by the following co-conspirators, acting together with others known and unknown to the Grand Jury, on or about the following times and dates, within the Central District of California and elsewhere, at a time when the co-conspirators identified were acting in their capacity as leaders, officers, full patched members, prospective and probationary members, or associates of the Mongols Gang, and with the intent to benefit the Mongols Gang:

61.   On or about March 16, 2002, in Riverside County, California, Mongols, including Walter Ramirez, attended an "ultimate fighting" match at the Morongo Casino in Cabazon, California, dressed in Mongols Gang vests displaying the Word and Rider Images, and provoked a riot, during which Walter Ramirez and other Mongols attacked J.D., P.S., W.C., J.G., A.L., M.L., and numerous other victims with knives, struck victims with chairs, and kicked them with steel-toed boots.

62.   On or about April 27, 2002, Mongols, including Ruben Cavazos, Sr., Walter Ramirez, and Benjamin Leyva, wearing Mongols Gang vests displaying the Word and Rider Images, engaged in an armed confrontation with "Hells Angels" gang members at

1  the Harrah's Casino in Laughlin, Nevada, during which Hells

2  Angels gang members R.T. and J.B. and Mongol S.B. were killed.

3       63.  On or about December 4, 2005, Mongols, including

4  Andres Rodriguez, Rafael Lozano, Alex Lozano, and Ricardo

5  Gutierrez, wearing Mongals gang vests displaying the Word and

6  Rider images, attacked rival gang members and members of the

7  public, including an off-duty fire department officer, as they

8  attempted to collect donations at a "Toys for Tots" event in

9  Norco, California.

10       64.  On or about March 11, 2006, at a Mongols Gang "All

11  Members" meeting in Los Angeles County, California, Mongols Gang

12  president Ruben Cavazos, Sr., wearing a Mongols Gang vest

13  displaying the Word and Rider Images, advised approximately 200

14  Mongols, many of whom were also wearing Mongols Gang vests

15  displaying the Word and Rider Images, that they should be alert

16  to the possibility of wiretap monitoring by federal law

17  enforcement agents and should be careful not to discuss

18  incriminating matters on the telephone.  Ruben Cavazos, Sr. also

19  discussed criminal investigations conducted by the Bureau of

20  Alcohol, Tobacco and Firearms, as well as the risk to the

21  Mongols Gang of prosecution for its racketeering crimes.

22       65.  On or about May 18, 2006, Mongols Gang leader

23  William Michael Munz recruited Mongols to retaliate against

24

1   rival "Hells Angels" gang members following an attack on a

2   Mongol and that Mongol's girlfriend.

3       66.  On or about August 17, 2006, Mongols Gang full patched

4   members Manuel Armendarez and Rafael Lozano sold approximately

5   57.2 grams of methamphetamine to an undercover law enforcement

6   officer.

7       67.  On or about November 6, 2006, in San Bernardino,

8   California, Mongols Gang full patched member Rafael Lozano sold

9   approximately 113.7 grams of actual methamphetamine to an

10  undercover law enforcement officer.

11      68.  On or about November 26, 2006, in Los Angeles County,

12  Mongols Gang full patched members Andres Rodriguez and David

13  Edward Gil sold approximately 56.7 grams of actual

14  methamphetamine to an undercover law enforcement officer.

15      69.  On or about December 4, 2006, at a Mongols Gang

16  "Mother Chapter" meeting in West Covina, California, Mongols

17  Gang president Ruben Cavazos, Sr., wearing a Mongols Gang vest

18  displaying the Word and Rider Images, advised other Mongols

19  present at the meeting, many of whom were also wearing Mongols

20  Gang vests displaying the Word and Rider Images, that he had

21  identified 20 to 25 "front-line warriors" for the Mongols Gang

22  who would be responsible for addressing the most significant

23  violent confrontations for the organization.  Cavazos also

24  directed Mongols to leave their weapons at his residence in

1   order to prevent them from being identified and seized by law

2   enforcement after the meeting.

3       70.   On or about December 10, 2006, Mongols, including

4   Shawn Buss, Abram Wedig, and Joseph Braden, wearing Mongols Gang

5   vests displaying the Word and Rider Images, attacked and beat an

6   African-American patron at the Tokio Lounge in Hollywood,

7   California, while shouting racist slurs at the victim.

8       71.   On or about February 14, 2007, Mongols Gang full

9   patched member Jose Norberto Montes and Mongols Gang associate

10   Austin Melcer beat L.H. to death at "Young's Tavern" in

11   Lancaster, California.

12       72.   On or about March 23, 2007, Mongols Gang full patched

13   member Manuel Armendarez sold approximately 55.5 grams of

14   methamphetamine to an undercover law enforcement officer.

15       73.   On or about April 8, 2007, Mongols Gang member Denis

16   Maldonado, wearing Mongols Gang clothing displaying the Word and

17   Rider Images, shot rival Maravilla gang members M.G. and Z.S. at

18   the "Nicola's" bar in Los Angeles, California.

19       74.   On or about April 8, 2007, Mongols Gang members drove

20   Denis Maldonado to San Diego, California, in order to prevent

21   Maldonado from being identified and apprehended by law

22   enforcement after Maldonado shot two victims at the "Nicola's"

23   bar in Los Angeles.

24

75.   In or about April 2007, in Los Angeles, California, Mongols Gang leaders Ruben Cavazos, Sr. and William Michael Munz rewarded Denis Maldonado with authorization to display a Mongols Gang full patch insignia, including the Word and Rider Images, tattooed on his head for having shot two members of the rival Maravilla gang on April 8, 2007.

76.   On or about June 23, 2007, in San Diego County, California, Mongols Gang leader William Michael Munz directed an unidentified co-conspirator to administer a polygraph examination to three undercover law enforcement officers as a condition to their prospective membership in the Mongols Gang.

77.   On or about July 19, 2007, Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., Hector Gonzalez, and others, conducted a Mongols Gang "Presidents" and "Sergeant-at-Arms" meeting in Los Angeles County, California, at which Cavazos told those present, many wearing Mongols Gang vests displaying the Word and Rider Images, that they needed to demonstrate the "strength and muscle" of the Mongols Gang; described the expansion of the Mongols Gang into other states across the nation; and discussed the need to use violence to expand the authority of the Mongols Gang into new areas not previously controlled by the Mongols Gang.

78.   On or about August 18, 2007, Mongols from Indiana, Oklahoma, and California, many wearing Mongols Gang vests

1  displaying the Word and Rider Images, used guns, knives, brass

2  knuckles, bullet-proof vests, and baseball bats to seize control

3  of bars and bar patrons and to then attack rival "Sons of

4  Silence" Motorcycle gang members at those bars in Indianapolis,

5  Indiana.

6      79.  On or about October 6, 2007, in Palm Springs,

7  California, Mongols Gang leaders, including Ruben Cavazos, Sr.,

8  awarded Mongols "Respect Few Fear None" patches to Mongols,

9  including Hector Gonzalez, Lawrence Wilson, Robert Rios, and

10  Daniel Medel, for having committed acts of violence on behalf of

11  the Mongols Gang.

12      80.  On or about October 6, 2007, in Palm Springs,

13  California, Mongols Gang leaders, including Ruben Cavazos, Sr.,

14  William Michael Munz, and Lawrence Wilson, issued a "Respect Few

15  Fear None" patch and a "Black Heart" patch to a Mongol as a

16  reward for that Mongol having engaged in a confrontation with a

17  rival gang member on behalf of the Mongols Gang in Indianapolis,

18  Indiana.

19      81.  On or about November 21, 2007, in Los Angeles,

20  California, Mongols Gang full patched member Enrique Munoz

21  possessed and attempted to transport approximately 66.8 grams of

22  methamphetamine.

23      82.  On or about December 22, 2007, Mongols Gang leaders,

24  including Ruben Cavazos, Sr., Ruben Cavazos, Jr., and Hector

Gonzalez, and other Mongols Gang members, wearing Mongols Gang clothing displaying the Word and Rider Images, conducted a Mongols Gang "Mother Chapter" meeting at Cavazos, Sr.,'s residence in West Covina, California, while Mongols Gang Prospects were required to maintain an armed presence outside the residence.

83.  On or about December 27, 2007, by telephone using coded language, Mongols Gang leaders Hector Gonzalez and Ruben Cavazos, Sr., discussed plans to collect $40 from all Mongols to pay legal costs for Mongols who were facing charges for crimes committed on behalf of the Mongols Gang.

84.  On or about December 28, 2007, at the shop of Mongols Gang leader Hector Gonzalez in El Monte, California, Mongols Gang leaders Hector Gonzalez, Ruben Cavazos, Jr., and Anthony Tinoco collected monthly dues form members of various Mongols chapters while prospective members provided security.

85.  On or about February 5, 2008, by telephone using coded language, Mongols Gang leaders Ruben Cavazos, Sr. and William Michael Munz discussed the Mongols Gang's conflicts with the Mexican Mafia based on the Mongols Gang's refusal to pay "taxes" to "La Eme" for its narcotics trafficking and the consequences of Mongols entering protective custody while in prison.

86.  On or about February 11, 2008, Mongols attacked rival "Hells Angels" gang members at the "Parkway Bowl" in El Cajon,

California, and admonished the victims that they were in Mongols Gang territory.

87. On or about February 14, 2008, by telephone, Mongols Gang leaders Ruben Cavazos, Sr., and Ruben Cavazos, Jr., discussed obtaining the Image Mark.

88. On or about February 17, 2008, in West Covina, California, Mongols Gang leader Ruben Cavazos, Jr., wearing a Mongols Gang vest displaying the Word and Rider Images, directed undercover law enforcement officers posing as Mongols Gang Prospects to store firearms in Ruben Cavazos, Jr.'s car.

89. On or about February 17, 2008, in West Covina, California, Mongols Gang full patched members Andres Rodriguez and Juan Nieves discussed retaliating against rival gang members who had shot at Nieves on February 1, 2008.

90. On or about March 17, 2008, in West Covina, California, Mongols Gang leaders, including Ruben Cavazos, Sr., Ruben Cavazos, Jr., Hector Gonzalez, and Arthur Roseli possessed on behalf of the Mongols Gang a loaded .22 caliber rifle, a Sturm Ruger mini-thirty rifle, a 12-gauge shotgun, .30 caliber rifle, two Taurus 9 mm handguns, five .45 caliber handguns, a .223 caliber rifle, a loaded 5.56 caliber rifle, and two .38 caliber revolvers.

91.  On or about April 6, 2008, Mongols Christopher Loza and John Newman stabbed R. H. and beat J. H. at a Mobil gas station in Pasadena, California.

92.  On or about April 10, 2008, in Montebello, California, Mongols Gang full patched member Ricardo Gutierrez sold approximately 107.1 grams of methamphetamine to an undercover law enforcement officer.

93.  On or about April 12, 2008, in Maywood, California, Mongols Gang leader William Michael Munz, wearing a Mongols Gang vest displaying the Word and Rider Images, addressed Mongols at an "all members" meeting, many wearing Mongols Gang vests displaying the Word and Rider Images, and told them that he believed Mongols Gang leader Ruben Cavazos, Sr., was being investigated for "terrorist recruitment." At the same meeting, Mongols Gang leaders William Michael Munz and Ruben Cavazos, Jr., directed Mongols to contribute to a fund for Ruben Cavazos, Sr.'s legal fees.

94.  On or about May 24, 2008, Mongols, some of whom were wearing Mongols Gang vests displaying the Word and Rider Images, displayed a .45 caliber semi-automatic handgun belonging to Mongols Gang leader Ruben Cavazos, Jr., and threatened D.Q. in the parking lot of the "Ordonez" restaurant in Montebello, California, stating to D.Q. that he was "f***ing with Mongols"

1   and that he would know who the Mongols were as a result.

2   Cavazos, Jr., hid the gun after the confrontation.

3       95.  On or about June 6, 2008, at the Mongols Gang's

4   "National Run" in San Diego County, Mongols Gang leader Ruben

5   Cavazos, Sr., awarded the "Respect Few Fear None" patch to

6   Mongols Christopher Loza and John Newman to reward them for the

7   attack on R.H. and J.H. in Pasadena, California, on April 6,

8   2008.

9       96.  On or about June 19, 2008, Mongols Gang full patched

10  members Alex Lozano and Rafael Lozano distributed approximately

11  62.5 grams of methamphetamine to an undercover law enforcement

12  officer.

13      97.  On or about July 26, 2008, Mongols Gang full patched

14  member Shawn Buss participated in a Mongols National Presidents

15  Meeting at which Mongols Gang members were advised to use

16  caution speaking on the phone or writing on the internet in

17  order to make it more difficult for law enforcement to detect

18  criminal conduct by Mongols Gang members.

19      98.  On or about August 30, 2008, in Vernon, California,

20  Mongols Gang leader Hector Gonzalez, wearing a Mongols Gang vest

21  displaying the Word and Rider Images, advised Mongols, many

22  wearing Mongols Gang vests displaying the Word and Rider Images,

23  that Gonzalez had met with Mexican Mafia representatives in

24

1  order to resolve conflicts between the Mexican Mafia and the

2  Mongols Gang.

3      99. On or about September 2, 2008, in San Francisco,

4  California, Mongol Christopher Ablett, wearing a Mongols Gang

5  vest displaying the Word and Rider Images, stabbed "Hell's

6  Angels" gang member M.G. repeatedly and shot M.G. in the head

7  and chest, killing him.

8      100. On or about September 17, 2008, in Los Angeles County,

9  California, Mongol Manuel Vasquez possessed with intent to

10 distribute approximately 7.9 grams of methamphetamine.

11     101. On or about October 10, 2008, at a Mongols Sergeants

12 at Arms meeting held in El Monte, California, Mongols Gang

13 leader Hector Gonzalez discussed the arrest of a Mongols member

14 for the recent killing of the president of the Hells Angels San

15 Francisco chapter and stated that the Mongols would back that

16 Mongols member by paying his legal fees, which could be

17 substantial.

18     102. On or about May 7, 2009, in Los Angeles County,

19 California, Mongols Edward Ramirez and Alberto Madrigal

20 possessed approximately 13 kilos of cocaine, kilo packaging

21 materials, vacuum seal bags, an electric vacuum sealer, and

22 Mongols Gang clothing and paraphernalia displaying the Word and

23 Rider Images.

24

103. On or about November 6, 2009, in Merced County, California, a group of 10-12 Mongols entered a bar and, while shouting "Mongols," stabbed to death B.J.

104. On or about May 25, 2012, in Wilmington, California, Mongols Gang member Carlos Mercado and Mongols Gang associate Aaron Collins shot at members of the Los Angeles County Sheriff's Department who were attempting to execute a search warrant at Mercado's residence.

FORFEITURE ALLEGATION

[18 U.S.C. § 1963]

105. The allegations in Counts One and Two of this Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

106. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to defendant MONGOL NATION that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of defendant's conviction on either of the two racketeering violations charged in this Indictment.

107. Defendant MONGOL NATION:

a.  has acquired and maintained interests in property in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), including interests in the Word and Rider Images, which are described more specifically below;

b.  has an interest in, security of, claims against, and property and contractual rights that afford a source of influence over the enterprise named and described herein, which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims,

1  and rights are subject to forfeiture to the United States

2  pursuant to Title 18, United States Code, Section 1963 (a)(2),

3  including the Word and Rider Images, which are described more

4  specifically below; and

5      c.  has property constituting and derived from proceeds

6  obtained, directly and indirectly, from racketeering activity,

7  in violation of Title 18, United States Code, Section 1962,

8  which property is subject to forfeiture to the United States

9  pursuant to Title 18, United States Code, Section 1963(a)(3),

10  including the Word and Rider Images, which are described more

11  specifically below.

12      108. The interests of defendant MONGOL NATION subject to

13  forfeiture to the United States pursuant to Title 18, United

14  States Code, Section 1963(a)(1), (a)(2), and (a)(3) include but

15  are not limited to:

16      a. All rights of any kind or nature associated with or

17  appurtenant to the trademark/service mark/association mark

18  consisting of the word "Mongols" that, at one time, was

19  registered with the USPTO under Registration No. 2916965,

20  whether used for purposes of commerce, associative purposes, or

21  any other purpose, whether in connection with promoting the

22  interests of persons interested in the recreation of riding

23  motorcycles or otherwise, and which has been used by defendant

24

1 | MONGOL NATION in the following form, the Word Image, among

2 | others:



10 |         b.    All rights of any kind or nature associated with

11 | or appurtenant to the trademark/service mark/association mark

12 | consisting of the Rider Image reproduced immediately below that,

13 | at one time, ws registered with the USPTO under Registration No.

14 | 3076731, whether used for purposes of commerce, associative

15 | purposes, or any other purpose, whether in connection with

16 | promoting the interests of persons interested in the recreation

17 | of riding motorcycles or otherwise, and which has been used by

18 | defendant MONGOL NATION in the following form:



109. If any of the property described above, as a result of any act or omission of defendant MONGOL NATION,

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

///
///
///
///
///
///
///
///
///

e.   has been commingled with other property that cannot be divided without difficulty, the court shall order the forfeiture of any other property of defendant MONGOL NATION up to the value of any property described above.


A TRUE BILL


/S/
_____
Foreperson


ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


ELIZABETH YANG
Assistant United States Attorney
Chief, Violent and Organized Crime Section